464 So.2d 284 (1985)
IT CORPORATION
v.
COMMISSION ON ETHICS FOR PUBLIC EMPLOYEES.
Nos. 84-C-1227, 84-C-1233.
Supreme Court of Louisiana.
February 25, 1985.
*285 R. Gray Sexton, Commission on Ethics for Public Employees, Baton Rouge, for Com'n on Ethics for Public Employees.
Charles S. McCowan, Jr., Pamela C. Walker, Kean, Miller, Hawthorne, D'Armons, McCowan & Jarman, Baton Rouge, for IT Corp.
CALOGERO, Justice.
This case presents a res nova question concerning the power and authority granted the Commission on Ethics for Public Employees by the Governmental Ethics Code (the Code). Specifically, the question is whether the Commission, after first finding a "state employee" to have violated provisions of the Governmental Ethics Code (in this instance La.R.S. 42:1112(A) and 1118) may not only cancel and rescind the contract between the employee and the state agency, but order, as well, return to the contracting state agency the consideration *286 received upon performance of the contract.
The basic facts giving rise to this action, stated simply, are that IT Corporation (ITC) was under contract with the state, through the Department of Natural Resources (DNR), to study and recommend an appropriate plan and site for a "Model Regional Hazardous Waste Recovery and Disposal Facility for Louisiana." The consideration for the study was $375,598.00. While under contract, ITC negotiated to buy the very land it ultimately recommended as the appropriate site for the disposal facility. ITC, while under contract with the state, also employed and paid compensation to one who was simultaneously employed by the state. After receiving complaints about ITC's activities, the Commission commenced an investigation of ITC and ultimately presented charges of Ethics Code violations in connection with these two matters.
A thorough and detailed recitation of the facts appears in the Commission's "Findings of Fact" in its April 22, 1983 opinion. We quote those "Findings of Fact", but have taken the liberty, for purpose of clarity, of rearranging in chronological order the eleven paragraphs and multiple subparagraphs:
"¶ 11(a) By correspondence of January 27, 1979, Ned A. Cole wrote to IT Corporation inviting IT Corporation to `discuss [the] opportunity' for IT Corporation to effectuate an expansion into Louisiana to assist in providing a solution to the waste disposal `problem.'
"¶ 11(b) By correspondence of March 30, 1979 Ned A. Cole forwarded to IT Corporation a preliminary proposal that he, Ned A. Cole, had prepared, consisting primarily of an outline for the subsequent submission by IT Corporation to the State, of the `Proposal for a Model Regional Hazardous Waste Recovery and Disposal Facility.'
"¶ 11(c) By cover letter of April 18, 1979 IT Corporation submitted to the State the `Proposal for a Model Regional Hazardous Waste Recovery and Disposal Facility.'
"¶ 11(d) The above-mentioned `Proposal' contains, among other things, declarations that Ned A. Cole, through Research Associates, would serve as a subcontractor to IT Corporation if it was awarded by the State a contract for the feasibility study and that `Ned Cole serves as Consultant to the Department of Natural Resources for projects including ... the hazardous waste management program and the formulation of rules and regulations governing hazardous waste....'
"¶ 11(e) Karen Cole, an employee of the Department of Natural Resources, prepared for execution by the Department of Natural Resources and IT Corporation a contract for the `Development of a Model Regional Hazardous Waste Recovery and Disposal Facility for Louisiana' dated April 25, 1979 and attached thereto as `Appendix A' a `Statement of Work' based substantially upon the information contained in the IT `proposal.'
"¶ 11(f) During the course of the Regular Session of the 1979 Louisiana Legislature, the Legislature was invited by House Concurrent Resolution No. 79 to suspend applicable provisions of the public bid law and the professional services contract law so as to authorize the Department of Natural Resources to enter into the `sole source' contract of April 25, 1979 with IT Corporation, which concurrent resolution failed to be adopted. Karen Cole thereafter prepared a `Request for Proposal for Conduct of a Study to Develop a Model Regional Hazardous Waste Recovery and Disposal Facility for the State of Louisiana', dated May 29, 1979, with cover letter of that date, and forwarded the request for proposal to a number of industrial concerns including IT Corporation; the `Statement of Work' contained in and made an integral part of the RFP was extracted by Ms. Cole substantially from the earlier proposal submitted by IT Corporation to the State and the subsequent `sole source' contract of April 25, 1979.
"¶ 11(g) By correspondence of May 31, 1979 Ned A. Cole wrote to IT Corporation observing that a major competitor of IT *287 Corporation, Catalytic Inc. had `not requested a copy of the RFP[and that] I doubt they are aware of the proposed guides for the project.'
"¶ 11(h) That same day, in separate correspondence of May 31, 1979, Ned A. Cole advised IT Corporation that he had `lined up' `Mayes' and `Smith' (two Research Associates employees or `associates') for the next visit to Louisiana by IT Corporation's representative, John Theiss.
"¶ 11(i) By letter of June 8, 1979, Ned A. Cole advised a representative of IT Corporation that he had caused RFP's to be sent to other industrial concerns in order to `insure that [there was no] criticism....' Cole notes during the course of his letter that he had answered in the `affirmative' a call concerning the RFP in which the question was asked whether or not the 60 day period meant that the project had to be completed in 60 days.
"¶ 11(j) On June 17, 1979 IT Corporation entered into the `subcontract' with `Research Associates of Louisiana' (signed by Ned A. Cole on behalf of Research Associates of Louisiana) which had attached to it an exhibit outlining the scope of services and referencing certain subparagraphs of the initial `Proposal for a Model Regional Hazardous Waste Recovery and Disposal Facility' submitted by IT Corporation to the State prior to April 25, 1979.
"¶ 11(k) At the time these events were occurring, Research Associates was under contract with the Department of Natural Resources for `special services, development of hazardous waste management system' by which Research Associates was required, generally, to prepare a hazardous waste management plan by developing the permit system and by development of standards as required by the interagency agreement with OSTEP: simultaneously, Research Associates was preparing for submission to the state a proposal in response to an RFP No. 21600-80-02 issued July 20, 1979 for an $830,000 contract to assist in the implementation of the State hazardous waste management program and, among other things, to perform permit evaluation germaine [sic] to the administration of the hazardous waste management program. This contract was in fact awarded to Research Associates, Inc. in September of 1979.
"¶ 11(1) By document dated June 27, 1979, IT Corporation submitted to the Department of Natural Resources its `Proposal for the Development of a Model Hazardous Waste Facility.'
"¶ 11(m) Other proposals were submitted for consideration.
"¶ 11(n) Sometime between July 9 and July 13, 1979, Karen Cole and Jim Porter, another employee of the Department of Natural Resources, prepared `checklist' evaluations of the several proposals submitted and thereafter recommended to the Secretary of the Department of Natural Resources that an award be made to IT Corporation.
"¶ 11(o) IT Corporation did not submit the lowest price for the proposal and, of those that were considered, submitted the next to highest price for the work to be performed.
"¶ 11(p) The proposal previously submitted by IT Corporation of June 27, 1979 listed as a proposed subcontractor Ned A. Cole who was represented as then `serv[ing] as Consultant to the Department of Natural Resources....'
"¶ 11(q) A statement of the work to be performed in the proposal submitted by IT Corporation was essentially the same statement of work contained in its earlier `Proposal for a Model Regional Hazardous Waste Recovery and Disposal Facility' and as contained in the `Statement of Work' integrated into the April 25, 1979 sole source contract.
"¶ 11(r) Karen Cole prepared a contract dated July 17, 1979, executed that date by the Secretary of the Department of Natural Resources rendering to IT Corporation an award of the contract for the preparation of a `Model Regional Hazardous Waste Recovery and Disposal Facility for Louisiana': for the price of $375,598.
*288 "¶ 1. On September 18, [report was dated September 20, 1979] IT Corporation submitted to the Department of Natural Resources a report entitled `Study Report: Model Regional Hazardous Waste Recovery and Disposal Facility' pursuant to its contract with the Department of Natural Resources designated by Nos. DNR XXXXX-XX-X, OCR431-001.
"¶ 2. In that report, IT Corporation recommended the selection and designation of a tract of land for location of the proposed Model Regional Hazardous Waste Recovery and Disposal Facility, described therein as `Area I', and being generally a tract of land theretofore owned by Mr. and Mrs. Shelby Robert (hereinafter referred to as the `Robert tract').
"¶ 3. Prior to the time the feasibility report was submitted to the Department of Natural Resources, IT Corporation, through its agents and representatives, made numerous contacts with Mr. and Mrs. Robert, individually, and through their attorney, Mr. Vincent Sotile, and actively engaged in negotiations with the Roberts, through their attorney, for the execution of an option for IT Corporation to acquire title to the Robert tract.
"¶ 4. Prior to September 18, 1979, and during the period of time that IT Corporation was in the process of preparing and formulating the feasibility report, IT Corporation procured soil borings on the Robert tract of land, had soil analyses done, and made or caused to be made numerous site inspections of the Robert tract.
"¶ 5. After submission of the feasibility report to the Department of Natural Resources on September 18, 1979, IT Corporation and Mr. and Mrs. Shelby Robert entered into an option agreement for the acquisition by IT Corporation of the Robert tract with an effective date of September 25, 1979. The option agreement was prepared by Mr. Sotile on behalf of both IT Corporation and the Roberts sometime prior thereto.

. . . . .
"¶ 11(s) IT Corporation submitted to the Department of Natural Resources on September 21, 1979 its invoice for the services performed pursuant to the feasibility study in the amount of $375,598 and, on the basis of recommendations by Karen Cole as to the correctness of the amount, James M. Hutchinson, a Department of Natural Resources official `okayed' payment to IT Corporation of that amount.

. . . . .
"¶ 6. IT Corporation was paid by the State for its preparation of the feasibility study on October 9, 1979 the agreed sum of $376,000.

. . . . .
"¶ 11(t) Though a `performance evaluation' report was executed by James M. Hutchinson on October 15, 1979, Mr. Hutchinson did not sign the report or affix his initials to it and the performance evaluation report was prepared by Karen Cole.

. . . . .
"¶ 7. By agreement entitled `subcontract' dated June 17, 1979, IT Corporation and Research Associates of Louisiana, Inc. (hereinafter referred to as `Research Associates') entered into a contract by which Research Associates was to render to IT Corporation services therein described but consisting generally of `site location analysis and recommendation' pertaining to IT Corporation's `feasibility study' contract with the Department of Natural Resources.
"¶ 8. Pursuant to this contract, IT Corporation agreed to pay Research Associates for its services the sum of $53,836.
"¶ 9. At the time IT Corporation agreed to pay this sum to Research Associates, and entered into the above-mentioned contract, and thereafter including and through the time Research Associates, Inc. was indeed paid by IT Corporation on October 22, 1979 the sum of $53,836, Research Associates, was a party to contracts with the Department of Natural Resources by which Research Associates, primarily through its principal, Ned A. Cole, rendered essential and comprehensive services in the field of hazardous waste management, including particularly the establishment and maintenance *289 of a comprehensive and integrated hazardous waste management program by the Department of Natural Resources.
"¶ 10. IT Corporation through its agents and representatives knew of the existence of one or more of these contracts at the time it entered into its `subcontract' with Research Associates, Inc.

. . . . .
"¶ 11(u) On the following dates payments were made by Research Associates, Inc. to Karen D. Cole: (1) July 2, 1979 $6,400, (2) August 2, 1979$1,200, (3) September 15, 1979$1,200, (4) January 19, 1980$1,000, (5) April 10, 1980$3,000, (6) July 1, 1980$500, (7) August 9, 1980 $500, (8) August 16, 1980$500, (9) October 14, 1980$750 and (10) November 20, 1980$1,750."
The Commission charged ITC with violating Section 1112(A) and Section 1118 of the Governmental Ethics Code.[1] Section 1112(A) prohibited a state employee from participating in a transaction involving the state in which he has a personal substantial economic interest. Section 1118 prohibited a state employee from giving anything of economic value, directly or indirectly, to any other state employee which the latter is prohibited from receiving under the Code (here §§ 1113 & 1114 prohibited a state employee from receiving compensation for services rendered from one who has a financial relationship with or is effected by the employee's agency.)
The Commission set a hearing for May 27 and 28, 1982. Prior to that hearing ITC secured supervisory writs to the Court of Appeal questioning the Commission's jurisdiction over ITC. In its decision of December 16, 1982, holding that the Commission had jurisdiction over ITC and remanding the case to the Commission for hearing, the Court of Appeal made the following additional findings: First, that "state employee" as defined in the Code, prior to amendment in 1979, included private corporations as well as individuals, and therefore a private corporation (ITC) could be subject to the jurisdiction of the Commission; second, ITC's execution of the contract with DNR constituted "performance of a state function under the authority of the laws of this state" thereby subjecting ITC to the jurisdiction of the Commission; third, ITC was a state employee on the date the real estate option to buy the recommended site for the waste disposal facility became effective and, therefore, acquired a "personal substantial economic interest" in its contract in violation of the Code; fourth, the research corporation with which ITC subcontracted was a "state employee" within the meaning of the Code; fifth, the powers granted the Commission did not infringe upon the exclusive jurisdiction of DNR; and sixth, the permits issued to ITC by the Environmental Control Commission were "licenses" within the meaning of the Code and, as such, were immune from either cancellation or rescission by the Commission. Neither party sought a rehearing in the Court of Appeal or writs to this Court from that judgment. Commission on Ethics for Public Employees v. IT Corporation, 423 So.2d 695 (La.App. 1st Cir.1982).
On remand, and after the hearing, the Commission found ITC in violation of the two sections of the Code (§ 1112(A) and § 1118) with which they were charged, imposed maximum fines of $5,000.00 for each of the two violations, declared void the July 17, 1979 contract between DNR and ITC, and ordered rescission of the contract and repayment of the $375,598.00 paid to ITC upon completion of that contract.
ITC appealed from that Commission determination. The Court of Appeal, First Circuit, affirmed the portions of the Commission's decision which found that ITC had violated two sections of the Governmental Ethics Code and which imposed the two $5,000.00 fines. By refusing to upset the Commission's action which ordered rescission of the contract the Court of Appeal, at least impliedly, affirmed that portion *290 of the Commission's findings. However, the Court of Appeal vacated and set aside the portion of the order requiring ITC to repay the $375,598.00 contract price. IT Corporation v. Commission on Ethics for Public Employees, 453 So.2d 251 (La.App. 1st Cir.1984).
Both parties sought writs from the Court of Appeal decision. Because the case presented res nova legal issues, we granted writs to both applicants, the Commission on Ethics for Public Employees and IT Corporation. Upon review of the entire case, we find that the Court of Appeal was in every respect correct in its judgment.
The primary question which prompted this Court to grant writs was whether the Court of Appeal might have been wrong in determining that the Commission could not order ITC to return the $375,598.00 contract price notwithstanding that they had legally "cancelled and rescinded" the contract "as being void."
The Court of Appeal's response to the Commission's contention that they had the legal power and authority to do so was that "the code does not expressly grant to the Commission the authority to order the return of the contract price." We conclude that the Court of Appeal was correct.
There were only two pertinent provisions of the old Ethics Code. La.R.S. 42:1121(C) and (F).[2] La.R.S. 42:1121(C), admittedly entitled "Rescission of State Action", simply provides that "the Commission may, in addition to any other available rights of rescission, cancel or rescind any state contract without contractual liability to the state where: `(1) the Commission has found that a violation of this part has influenced the making of such state contract; and (2) the Commission finds under all of the circumstances that the interests of the state so require ...'" (emphasis provided)
La.R.S. 42:1121(F), where provision is made to facilitate the recovery of damages, does not allow the Commission to order repayment of the contract price. That statute merely allows the Commission (or the Attorney General or District Attorney) to bring a civil action in the district court against any state employee or former state employee who shall, to his economic advantage, have acted in violation of the code, to recover on behalf of the state an amount equal to such economic advantage.
The Commission's position, that they may order return of the contract price, is based upon "implied" authority. "Why should two separate judicial proceedings be required to adjudicate one case," they argue. And further they contend that "To deny the power is to impair the future capacity of the Commission to effectively deal with codal violations."
Their argument in this regard may not be entirely implausible. Nonetheless it is one which better directs itself to the Legislature, which so far has not reposed in the Commission this essentially judicial or quasi-judicial power.
What authority the Legislature has given the Commission, however, is a substantial one. They may cancel or rescind a state contract without contractual liability to the state. And, as the Commission points out in brief the authority to "cancel" is distinguishable from the authority to "rescind" a contract. To "cancel" a contract is to set aside an unperformed agreement and to relieve one or both parties from the responsibility of executing the contract. To "rescind" suggests the authority to set aside and vacate fully or partially consummated obligations and to restore the State to the position it was in prior to the execution of the agreement. "Rescind" has been given the following meaning:
... [t]o declare a contract void in its inception and to put an end to it as though it never were.... Not merely to terminate it and release parties from further obligations to each other but to abrogate it from the beginning and restore parties to relative positions which they would have occupied had no *291 contract ever been made.[3] (Emphasis added.)
The Commission has cancelled and rescinded the contract in this case. That determination has been reviewed and approved by the Court of Appeal and, now in this opinion, by this Court.
ITC may not rely upon that contract for retention of the $375,598.00 should the Commission (or the Attorney General or the District Attorney) bring a civil action for damages (R.S. 42:1121(F)), or return of the consideration paid under the contract. Such a lawsuit, if filed, will present the proper time for the courts to decide whether ITC Corporation has enjoyed an economic advantage and the extent thereof, and/or whether the state should be permitted to recover the $375,598.00 or some portion thereof. In that lawsuit due consideration can be given to ITC's argument that they have earned all or part of the contract price on the basis of quantum meruit. Any other viable defenses, factually or legally, might also then be asserted and adjudicated in that litigation.
For the foregoing reasons we conclude that the Court of Appeal was not wrong in determining that the Commission could not legally order ITC to return the $375,598.00 contract price which, as we earlier indicated was the major issue which prompted us to grant writs in this case.
There are, however, additional issues which are before us at this time. Those remaining issues presented by the parties here in brief are contained in one additional Commission assignment of error and four ITC assignments of error. We have reviewed and considered each of them and we find them non-meritorious. The Court of Appeal's disposition on each of these assignments was correct.
In the Commission's remaining assignments of error they contend that they have the power and authority to set aside a permit where a code violation has influenced its issuance. Pertinently they want to be permitted to consider cancelling and rescinding the permits issued to ITC by the Department of Natural Resources. The Court of Appeal in its earlier opinion of December 16, 1982 disposed of that contention, resolving that the Commission does not have that power or authority. Commission on Ethics for Public Employees v. IT Corporation, 423 So.2d 695 (La.App. 1st Cir.1982).
When the Commission did not timely seek writs here from the 1982 Court of Appeal judgment in this matter, that judgment became final. And while it might be argued that since that Court of Appeal decision came about in an interlocutory proceeding it is not binding on this Court now, we are not persuaded by that argument. The Court of Appeal decision concerning the Commission's lack of authority to revoke ITC's permits was a final one, preventing the Commission, on remand, from entering evidence concerning the point or otherwise pursuing that remedy below. Lengthy proceedings have taken place following the Commission's decision not to complain. There is no more reason for us to review now that aspect of the 1982 Court of Appeal decision than there is for us to entertain ITC's argument that the Court of Appeal erred therein finding that they were a "state employee" under the Code, which we also decline to entertain at this time.[4] Accordingly, this assignment of error by the Commission has no merit.
ITC's first and second assignments of error are complaints that the Commission and the Court of Appeal were wrong in finding that the law and the evidence established ITC's violation of Sections 1112(A) and 1118 of the Code respectively, the charges which arose out of ITC's negotiating for and securing options to purchase the land which as the state's consultant ITC recommended as the appropriate site for the disposal facility, and ITC's illegally employing and paying compensation to Research Associates, a state employee at *292 the time. The law and ample evidence in the record support those findings. The Commission and the Court of Appeal were correct in their determination that ITC violated those sections of the Code.
ITC's third assignment of error, a complaint that the Court of Appeal should not (or perhaps did not), affirm the Commission's cancelling and rescinding the contract, likewise is without merit. ITC was found to have violated two sections of the Code, and accordingly, the Commission had the power, which they exercised, to cancel and rescind the contract. As noted earlier in this opinion the power to rescind is the power to set aside and vacate partially as well as fully consummated obligations. The Commission acted within its authority in ordering the contract between DNR and ITC rescinded, and it was not error for them to do so. We read the Court of Appeal opinion as affirming that action of the Commission and we affirm the decision in that respect.
ITC's fourth assignment of error to this Court complains that the Commission erroneously imposed the two $5,000.00 fines. ITC based its contentions in this regard on the argument that the Commission had no authority to impose such fines under the pre-1980 Code.
While ITC is correct that the pre-1980 Code did not authorize the Commission to impose such fines, it did provide for such civil penalties of $5,000.00 for each violation of the Code. But the procedure for pursuing the penalty was by civil action in district court based upon the Commission's finding of a violation of the Code. La.R.S. 42:1121(G). That procedure was changed in the 1979 revisions of the Code to allow the Commission to impose the fines. La.R.S. 42:1153. This latter procedure was utilized in the instant case where all the Commission proceedings occurred after the effective date of the codal revision, as did some of the actions which supported the factual findings of Code violations.
Furthermore, it has not gone unnoticed that these contentions by ITC have not been timely asserted. ITC did not specify this error in their assignments of error which were filed with the Commission as required by law. La.R.S. 42:1142; Uniform Rules of the Courts of Appeal, Rule 3-1.1; Louisiana Court of Appeal, First Circuit, Rule 1. To the contrary, ITC's original assignment of error having anything to do with the imposition of the two $5,000.00 fines dealt only with the harshness of the penalties imposed against them, the maximum fines and return of the contract price. It was not argued at that time that the Commission lacked the authority to impose the fines. Accordingly, we find no merit in this assignment.
ITC's concluding assignments, five and six, are that the Commission did not rule separately upon the proposed findings of fact and of law which had been submitted to the Commission by ITC and that the Commission did not follow the requirements of La.R.S. 49:950 and 42:4.1 et seq. of the Administrative Procedure Act. With respect to the former, the submitted proposed findings of fact and conclusions of law were considered by the Commission. The Commission's own findings of fact and conclusions of law effectively adopted and/or rejected each of the proposals. With respect to the latter, the hearing by the Commission sufficiently comported with the APA requirements. There were no violations of due process of law in the Commission's hearings and deliberations.

Decree
For the foregoing reasons the judgment of the Court of Appeal is affirmed.
AFFIRMED.
DENNIS, J., concurs in part with dissents in part with reasons.
LEMMON, J., dissents in part and assigns reasons.
NOTES
[1] The reference here is to La.R.S. 42:1112(A) and 1118 prior to reenactment of the Code by Acts 1979, No. 443, & 1, effective April 1, 1980. Under the new Code the almost identical provisions appear respectively as Sections 1112 and 1117, of R.S. Title 42.
[2] It is worth noting that the counterpart provision to 1121(C) and 1121(F) in the new Code, are 1152 and 1155, respectively, and that they are essentially similar provisions.
[3] See Blacks Law Dictionary 1471 (Revised 4th ed. 1968).
[4] ITC similarly did not seek writs in this Court after the 1982 Court of Appeal opinion.